UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| Darcy L. LaPier, | ) | Case No. 6:18-bk-03643-CCJ |
| | ) | Chapter 7 |
| Debtor. | ) | |
| | ) | |
| | ) | |
| Marie E. Henkel, Chapter 7 Trustee | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary No. _:__-ap-_____ |
| | ) | |
| Darcy L. LaPier, Dash ta da Moon, LLC, Barn Door Enterprises, LLC, and the Darcy LaPier Snodgrass Trust, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**TRUSTEE'S COMPLAINT (I) FOR DECLARATION OF ALTER EGO, (II) DETERMINING PROPERTY OF THE ESTATE, AND (III) SEEKING TURNOVER, ACCOUNTING, AND RELATED RELIEF**

The Chapter 7 Trustee, Marie E. Henkel (the "Trustee"), for her *Complaint (I) for Declaration of Alter Ego, (II) Determining Property of the Estate, and (III) Seeking Turnover, Accounting, and Related Relief* (the "Alter Ego Complaint") respectfully represents as follows:

**PRELIMINARY STATEMENT**

1.      On June 18, 2018 (the "Petition Date"), Darcy L. LaPier (the "Debtor") filed her voluntary petition for relief under chapter 7 of title 11 of the United States Code (the "Bankruptcy Code"). However, the Debtor began to experience financial difficulties over a decade ago and contemplated filing bankruptcy as early as 2012.

2.       After realizing her perilous financial situation, the Debtor began to take steps to conceal her assets from her creditors.  The Debtor allegedly transferred her lavish estate and substantially all of its contents to her ex-husband, while retaining the estate as her principal residence through the present date.  She then created two entities (Dash and Barn Door, as defined below), listed her children (two of whom were minors) as the members of those entities, and set up entity bank accounts that she began to use — and continues to use — to pay her personal expenses.

3.       Neither the entities nor their assets, including their respective bank accounts, were ever used for a valid business purpose and the entities *never had business operations*.  Instead, the Debtor placed all of her assets in the name of these entities in an attempt to keep them out of the reach of her creditors.  The Debtor has claimed that she has absolutely *no* assets since 2009, all the while living in a mansion containing valuable personal property, including many quarter horses and vehicles, and receiving (and in turn, spending) between $20,000-50,000 (and often more) per month through the entities' bank accounts.

4.       The Debtor uses the funds in these bank accounts, including the millions of dollars she receives from her ex-husband (as explained in further detail below), to finance her extravagant personal purchases and lifestyle.  Meanwhile, the Debtor has not made a *single* payment on the debts represented by filed proofs of claim in this bankruptcy case in several years.  The Debtor intentionally concealed assets, including cash, which were available to her during and prior to the one year preceding the Petition Date, for the benefit of herself and her family members, in order to prevent her legitimate creditors from collecting on their claims.

5.       As a result, the Court should find that (i) Dash, Barn Door, and the Trust (as defined below) are the Debtor's alter egos and/or nominees, (ii) the assets of Dash, Barn Door, and the

Trust are property of the estate that must be turned over to the Trustee, and (iii) the Trustee is entitled to all other relief sought in this Complaint in order to uncover the full extent of the Debtor's deception regarding her assets and recover such assets for the benefit of the Debtor's creditors.

## JURISDICTION AND VENUE

6.      The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

7.      Venue in this Court is proper pursuant to 28 U.S.C. §§ 1409 and Local Rule 1071-1 of the United States Bankruptcy Court for the Middle District of Florida.

8.      This adversary proceeding presents a core proceeding pursuant to 28 U.S.C. § 157(b).  To the extent it may be determined that this adversary proceeding does not present a core proceeding under 28 U.S.C. § 157(b)(2), the Trustee consents to this Court's entry of a final order and judgment.

## PARTIES

9.      Plaintiff Marie Henkel was appointed on June 18, 2018 as the acting Chapter 7 Trustee of the Bankruptcy Estate of Darcy L. LaPier (the "Bankruptcy Estate") and remains in that capacity to date.

10.     Defendant Darcy L. LaPier, the Debtor in the above-captioned bankruptcy case, is an individual residing in the State of Oregon.  She may be served with process at 36550 NE Wilsonville Rd., Newberg, Oregon 97132.

11.     Defendant Dash ta da Moon, LLC ("Dash") is a limited liability company incorporated under the laws of Oregon on or about May 3, 2010 with the address 36550 NE Wilsonville Rd, Newberg, Oregon 97132.  Dash may be served with process though its registered agent, Darcy LaPier, at the address listed above, or pursuant to the Federal Rules of Civil Procedure, wherever it may be found.

12.     Defendant Barn Door Enterprises, LLC ("Barn Door") is or was a limited liability company incorporated under the laws of Oregon on or about March 10, 2010 with the address P.O. Box 3915, Wilsonville, Oregon 97070.  Barn Door may be served with process though its registered agent, Darcy LaPier, at the address listed above, or pursuant to the Federal Rules of Civil Procedure, wherever it may be found.

13.     Defendant Darcy LaPier Snodgrass Trust (as the same may have been amended or modified, the "Trust") was formed by the Debtor on or about May 21, 1999, and the Debtor is the trustor, beneficiary, and trustee of the Trust.  The Trust may be served with process though Darcy LaPier, at the address listed above.

## FACTUAL BACKGROUND

14.     All allegations contained in the Trustee's Complaint Objecting to Discharge Under 11 U.S.C. § 727 are incorporated herein by reference for all purposes pursuant to Federal Rule of Civil Procedure 10(c) as incorporated by Federal Rule of Bankruptcy Procedure 7010 and other applicable law.

## I.    GENERAL BACKGROUND

15.     The Debtor has been married six times.  She was married to Ronald J. Rice ("Rice"), the founder and then-owner of Hawaiian Tropic Sun Care Products from approximately 1990-1992 and again from 2013-2017.  During their first marriage, the Debtor and Rice had a daughter, Sterling Rice, who was born in 1990.  Since their first marriage, the Debtor and Rice have remained on relatively friendly terms, apparently largely due to Sterling (Rice's only child).  The Debtor and Rice have spent virtually every holiday together for the past 27 years.  Even after the Debtor's divorce from Rice in December 2017, the Debtor has remained in contact with Rice, has spent significant time with him, and has stayed at his houses on multiple occasions.

16.     The Debtor has two other children, Nicolas VanVarenberg, who was born in 1995, and Madison Snodgrass, who was born in 2003.

17.     In the mid-2000s, the Debtor formed dozens of companies with her then-husband, Brian Snodgrass, to develop real estate.  The Debtor caused the Trust to provide millions of dollars to the businesses.  Upon information and belief, the Debtor inherited the majority of the money in the Trust in 2000, when her husband at the time (Mark R. Hughes) passed away.[1]

18.     In 2004, the Trust acquired certain property located at 36550 and 36860 NE Wilsonville Road, Newberg, Oregon 97132 (the "Oregon Estate") for approximately $7.1 million.[2] Since purchasing the Oregon Estate in 2004, the Debtor and the Trust spent hundreds of thousands of dollars, if not more, on additions and improvements to the property.  At her 2004 examination, the Debtor testified that the Oregon Estate cost "at least" $30 million to build.  The Debtor has maintained the Oregon Estate as her primary residence since it was acquired in 2004.

19.     In 2007, the Debtor and Mr. Snodgrass' various real estate companies began to struggle, and several loans that had been taken out by the Debtor, the Trust, Mr. Snodgrass, and/or one or more of their companies became due and payable.  The Debtor was obligated as an original obligor or guarantor on indebtedness to numerous creditors and lenders for tens of millions of dollars.  Several lenders filed suit and obtained judgments against the Debtor when she and Mr. Snodgrass were unable to make the required loan payments.

---

[1] The Debtor inherited at least $24 million at Hughes' death and is believed to have received several million dollars from her divorce from Jean-Claude Van Damme.

[2] The Oregon Estate is comprised of approximately twenty-five acres along the Willamette River in Oregon's wine country.  It features an ornate, approximately 10,000 square foot custom home, as well as a smaller, 3,000 square foot guest house (the "Guest House"); large horse barns and equestrian facilities; two boat docks; a playground; tennis courts; a personal gym, complete with workout equipment; and two private pools with cabana facilities and a bar.

20.     The Debtor defaulted on her obligations to creditors no later than April 2008[3] and by August 13, 2009, judgment creditor Banner Bank took its first post-judgment deposition of the Debtor.[4]

21.     In August 2008, shortly after their real estate business began to falter, the Debtor and Mr. Snodgrass asked Rice to purchase the Oregon Estate, along with "all furniture and art currently in" the Oregon Estate, for $6 million.  This purchase price was suggested by the Debtor and/or Mr. Snodgrass.  Mr. Snodgrass suggested the closing of the sale occur in less than a month from the date of the proposal, because "[t]ime is of the essence."

22.     Two months later, pursuant to the terms of that certain *Purchase and Sale Agreement and Joint Escrow Instructions* dated as of October 24, 2008 (the "Purchase and Sale Agreement"), the Trust transferred the Oregon Estate, along with the majority of the personal property inside, to Rice for approximately $8.3 million (the "Oregon Estate Transfer").   The purchase price was comprised of (i) the original $6 million purchase price proposed by the Debtor and Mr. Snodgrass and (ii) satisfaction of an outstanding debt owed to Rice of approximately $2,250,000.00, plus accrued and unpaid interest.

23.     Notwithstanding this "sale," the Debtor has continued to maintain the Oregon Estate as her primary residence, and has remained in custody and control of all of the personal property therein, including the personal property allegedly sold to Rice.[5]  In her Statement of Financial Affairs [Docket No. 1] (the "SOFA"), the Debtor states that she is holding or controlling

---

[3] As an example, the Debtor defaulted in making a $6.5 million loan payment to RBC Real Estate Finance Inc. (or its successors or assigns) ("RBC") on April 1, 2008.

[4] The judgment was entered against the Debtor and her related real estate businesses on May 5, 2009.

[5] Other than one rent payment of $5,000 to Rice shortly after the "sale," the Debtor has lived in the Oregon Estate rent-free through the present date.  The Debtor testified that Rice purchased the Oregon Estate so that Sterling could continue living there.  However, just a few years later, in 2011, Rice found Sterling her own home in Portland.  Rice testified in his Rule 2004 examination that he has never seen the master bedroom in the Oregon Estate and in 2015, during their second marriage, the Debtor testified that she was the only person living at the Oregon Estate.

"all household furnishings [and] appliances in Oregon [and] Florida" and that all such assets are owned by Rice. In her bankruptcy schedules [Docket Nos. 1 and 9] (collectively, the "Schedules"), the Debtor lists monthly expenses in the amount of $16,818.00 for "Expenses of Ex-Spouse home [and] horse farm costs."

24.     As of the Petition Date (as defined below), the Debtor owed approximately $30 million to multiple creditors with final judgments. Less than a year after the Banner Bank judgment was entered in May 2009, in an effort to hide her assets from creditors, the Debtor formed the two entities that are Defendants herein: Barn Door and Dash.

## II.   THE DEBTOR HAS FULL CONTROL OVER DASH AND USES IT IN AN ATTEMPT TO SHIELD HER ASSETS FROM HER CREDITORS

25.     All of Dash's assets are, in reality, assets of the Debtor that are property of the estate. Similarly, all transfers made to or by Dash are transfers of estate property by the Debtor that are potentially subject to avoidance and recovery under chapter 5 of the Bankruptcy Code.

26.     Statements by the Debtor regarding two transfers to Rice, totaling $1.4 million (collectively, the "$1.4 Million Transfers"),[6] illustrate the Debtor's mindset in using Dash to shield her assets from her creditors.

27.     In exchange for Rice's contribution of funds to the Debtor, which, as disclosed in the Rice Prenup (as defined below) were "consumed and used *solely for [the Debtor's] use and benefit* over a period of years . . . ." (emphasis added), the Debtor decided to make the $1.4 Million Transfers. At least one of the two $1.4 Million Transfers was made from a bank account in Dash's

---

[6] The $1.4 Million Transfer was comprised of two transactions: 1) a transfer of $900,000.00 on February 22, 2011 from an unknown bank account notated "Darcy" by Jennings and 2) a transfer of $500,000.00 on April 6, 2012 from a bank account in the name of Dash ta da Moon LLC. The Debtor has failed to produce any records to the Trustee regarding the source of the funds for the $1.4 Million Transfer or how the funds were used.

name.  As stated by Rice's accountant, William Jennings ("Jennings"),[7] during his 2004 examination:

| | |
|---|---|
| Trustee's Counsel: | Can you describe the circumstances where [the Debtor] transferred $1.4 million to Mr. Rice, as described in [the exhibit before Jennings]? |
| Jennings: | Yes.  And reading this, I guess I did — do remember that she — I knew she had creditors at that point in time. |
| | I think I got a call, maybe from [Rice], just telling me that [the Debtor] was going to pay him back some of the money that he had been spending on her, and so I — I think we provided the information, you know, necessary for her to transfer the money. . . |
| Trustee's Counsel: | Okay.  Was it your understanding that [the Debtor] transferred the money to Mr. Rice? |
| Jennings: | Well, I thought it was – you know, I wasn't focused on which entity was transferring the money.  I did see later on the documentation that it was [Dash] that had transferred the money, at least on one of the bank – one of [Rice]'s statements that received part of that money it showed [Dash]. |

28.    No later than the fall of 2012, the Debtor was planning to file for bankruptcy and sent her draft bankruptcy documents to Jennings to review.[8]  After doing so, Jennings expressed

---

[7] During Rice's Rule 2004 examination, he professed to have little knowledge or memory about most financial transactions with the Debtor, but indicated that Jennings would likely know the particulars.  Jennings has been employed by Rice or his various companies since the 1980s and currently manages Rice's family office.  Jennings is a certified public account licensed in the state of Florida.  As Rice has aged, Jennings has taken on an increasing amount of responsibility over the financial details of Rice's various investments and business ventures.  At all relevant times, Jennings was an agent for Rice with actual or apparent authority to negotiate contracts and conduct business arrangements for Rice.

[8] Paragraph 10E of the *Stipulation General Judgment of Dissolution of Marriage*, filed on September 14, 2012 in the Circuit Court of the State of Oregon for the County of Yamhill, in the divorce proceeding of the Debtor and Brian Snodgrass, provides, in part, that "[I]t is specifically contemplated that both parties will file for bankruptcy. . . ." Similarly, the Rice Prenup provides, in part, that "Wife may be in the process of seeking relief in bankruptcy from debts and obligations which were incurred . . . ."  Additionally, in her sworn answers to Plaintiff's Post-Judgment Interrogatories on October 15, 2012 in the case styled *Shannon Gozzi vs. Brian Snodgrass and Darcy Snodgass*, the Debtor indicated that she does not intend to pay the approximately $21,871,896.00 of claims against her, but instead indicates that the claims "will be discharged pursuant to chapter 7 of the U.S. Bankruptcy Code."

concern about the Debtor's failure to disclosure the $1.4 Million Transfers.  In response, the Debtor

replied:

> I think you have forgotten I personally haven't made any personal
> transfers… I only have made a re payment [sic]/reimbursement on behalf
> of the kids [sic] company, as I'm only a manager/member…I'm not an
> owner or have any interest in dash llc [sic]… So I believe you can relax as
> you remember these facts.

29.    Thus, the Debtor used funds in the name of Dash to repay Rice for funds that were

used "solely for her use and benefit" — and then stated that those transfers were not "personal"

and disclaimed any interest in Dash, instead asserting that the company belonged to her children.

30.    This exemplifies all of the Debtor's financial dealings for the last decade.  The

Debtor admitted in a deposition on January 6, 2014 that a creditor had previously garnished funds

in an account in her own name.  To avoid garnishment from occurring again, the Debtor placed —

and continues to place — all of her assets into the name of LLCs, while using the assets without

restriction and for her personal benefit.  The Debtor would have this Court believe that simply

titling bank accounts and other assets in the name of a limited liability company permits her to

evade the claims of her creditors.

### A.    <u>The Debtor has full control over Dash</u>

31.    The Articles of Organization for Dash were filed with the Oregon Secretary of State

on May 3, 2010.  Dash's formation documents indicate that Dash is member-managed, but at the

time Dash was organized, there were no members.  The only individuals listed in the Articles of

Organization are (i) the Debtor, as the manager of Dash, and (ii) an employee of the Debtor's ex-

husband, Brian Snodgrass, as Registered Agent.  Less than two months later, the Debtor substituted

herself as Dash's Registered Agent.

32.    Nearly three months after Dash's formation, the Debtor amended Dash's Articles

of Organization to list her three children as the members of Dash.  On the date of this amendment

(July 20, 2010), the Debtor's children were 20, 14, and 7 years old, respectively.  Although the Debtor maintains that her children are the owners and in control of Dash, she stated during a 2015 deposition that her children do not have any involvement in Dash:

| | |
|---|---|
| Sterling Bank's Counsel: | Do any of the children have a role – they're listed here [on the Secretary of State listing] as members of this business.  Do they have any involvement in the business? |
| The Debtor: | It's not really a business.  I mean, Sterling is the heir of everything of Ron's.  That property will be Sterling's when Ron passes. |
| Sterling Bank's Counsel: | Okay.  But do they have any involvement in operating this business that's reflected in [the Secretary of State listing]? |
| The Debtor: | I wish.  No. |

33.     Furthermore, Rice has no control over Dash.  During his Rule 2004 examination, Rice testified that he never held an interest in or control over Dash or its assets.  Jennings confirmed this in his own Rule 2004 examination and further testified that Rice never had an equity interest in, or served as a member or manager of, Dash.  Rice is not familiar with Dash's bank accounts and does not have authority to write checks on Dash's account.  Rice also indicated that he did not know why the Debtor made the $1.4 Million Transfers.

34.     The Debtor, however, has full control of Dash and its assets.  Indeed, on April 30, 2018, notwithstanding her repeated disavowing of an interest in Dash, the Debtor filed an Amended Annual Report for Dash and signed it as "Member."  As of the date hereof, Dash is still active with the Oregon Secretary of State, the Debtor is listed as Dash's manager and registered agent, and the Debtor's three children are listed as Dash's members.  In her SOFA, the Debtor states that she owns or has a connection to Dash as the manager and registered agent.

35.     There are two bank accounts at U.S. Bank, N.A. in the name of Dash (account numbers ending in 5008 and 5867) (collectively, the "Dash Accounts").  In her Rule 2004

examination, the Debtor testified that she has a checkbook and a debit card for the Dash Accounts and routinely writes checks on the Dash Accounts.  The Debtor indicated that she makes transfers from the Dash Accounts "all the time."  As described in further detail below, the Debtor directs payments to and from the Dash Accounts and uses the vehicles, quarter horses, and other assets in the name of or otherwise "belonging" to Dash for her personal benefit and without restriction or prior authorization from any other party.

**B.    The Debtor uses her control over Dash to engage in improper conduct that is harmful to her creditors**

**i.    Dash does not have legitimate business operations**

36.    In a deposition taken by Sterling Savings Bank, N.A. in 2015, the Debtor stated that "there's no business," related to Dash, that "[i]t's just something that sits there," "[i]t's not really a business," that it has no books and records, and that it "probably should be" dissolved.  She reiterated, "I mean, there's no business.  There's no – it's not a business.  It's not like a business." In the same deposition, the Debtor also claimed that she did not have an interest in Dash and that she did not know anything about it.

37.    In her Rule 2004 examination, the Debtor testified again that Dash has never operated, it does not have books and records or members' agreements, and that she does not have any minutes of Dash's member meetings.  She also stated that Dash has never filed tax returns and that Dash does not have an operating agreement or similar document because "we haven't done anything yet."

**ii.    Dash is used solely for the personal benefit of the Debtor**

38.    The Debtor testified at her Rule 2004 examination that she pays for her personal living expenses, like gasoline, with cash from or checks written on the Dash Accounts.  She also personally benefits from all of the assets in Dash's name.  As shown by the testimony that has been

elicited in this bankruptcy case and the bank statements produced by the Debtor (and described in further detail below), Dash is used solely for the personal benefit of the Debtor.

> ### a) *The "Darcy Allocation" is used for the Debtor's personal living expenses and was directed into Dash's bank accounts by Debtor to avoid garnishment by the Debtor's creditors*

39.     In the same month that Dash was formed in 2010, Rice began providing tens of thousands of dollars per month to the Debtor through Dash.  In a prenuptial agreement entered into by the Debtor and Rice prior to their second marriage in 2013 (the "Rice Prenup"), both parties agreed that neither party would be entitled to alimony, separate maintenance, or support upon the dissolution of their marriage.  However, the Rice Prenup also states that Rice has provided, and can continue to provide, "gratuitous assistance" to the Debtor, and that the Debtor waived any argument that such assistance establishes a claim for alimony or support.

40.     To date, Rice continues to provide this "gratuitous assistance" by paying upwards of $20,000.00 per month (and often more) to the Debtor through Dash, even after their divorce in December 2017.  The Debtor insists that she has no personal interest in these funds, even though she admitted in her Rule 2004 examination, as indicated above, that her personal expenses are paid out of the Dash Accounts.

41.     In her Schedules, however, the Debtor admits that she receives ***monthly income*** in the form of "Prop[erty] Maintenance [and] Pers[onal] Support from Ex-Spouse" in the amount of $19,201.00 per month.   It is undisputed that these monthly payments — again, included as "income" to the Debtor in her Schedules — are deposited into accounts in the name of Dash. Indeed, in her Rule 2004 examination, the Debtor admitted that this income comes out of a Dash Account.

42.     Furthermore, at his Rule 2004 examination, Jennings testified that these funds (what he refers to as the "Darcy Allocation") go solely to benefit the Debtor and that Rice has no

business relationship with Dash.  Rather than being paid to Dash for any business purpose, Jennings testified on three separate occasions in his examination that the funds from Rice are directed to Dash, rather than the Debtor, individually, ***based solely upon the Debtor's request***:

| | |
|---|---|
| Counsel for the Trustee: | We'll get into it more later, but there certainly is a large number of payments from Mr. Rice to Dash ta da Moon, LLC, right? |
| Mr. Jennings: | Correct. |
| Counsel for the Trustee: | Okay.  And can you describe why Mr. Rice would be paying money to Dash ta da Moon, LLC? |
| Mr. Jennings: | Well, as you're aware, Ron provides funds to Darcy, and she asked for the funds to flow through that entity.  She asked that that be the entity to whom we made the payments. |
| Counsel for the Trustee: | Okay.  And when did Darcy make that request for the funds to flow through Dash ta da Moon, LLC?  Was that a long time ago?  Many years ago?  Recent? |
| Mr. Jennings: | It was a long time ago. I think we provided you check registers that would show when the payments flipped to Dash ta da Moon. |
| | . . . |
| Counsel for the Trustee: | Well, did anyone else tell you why payments from Mr. Rice should be made to [Dash]? |
| Mr. Jennings: | It was only based upon [the Debtor's] request. |
| | . . . |
| Counsel for the Trustee: | And each time there is an entry for "Darcy monthly expense allocation," the actual check was made payable to Dash ta da Moon, LLC? |
| Mr. Jennings: | Correct. |
| Counsel for the Trustee: | That was at the request of [the Debtor]? |
| Mr. Jennings: | Yes. |

43.     The check registers referenced by Jennings in the testimony quoted above show payments to Dash notated "Darcy Monthly Expense Allocation" as far back as May 31, 2010 – the same month Dash was formed.  Mr. Rice also testified in his Rule 2004 examination that he does not know why payments for the Debtor's living expenses were made to a Dash Account instead of the Debtor's personal bank account.

44.     In her Rule 2004 examination, when asked if she had "any type of an arrangement with [Rice] or [Jennings] that the money to reimburse expenses for you and the kids, be put into the [Dash] account versus some other account," the Debtor replied, "[n]o."  She then testified that the payments were made to a Dash Account, rather than to a bank account in her own name, simply because it was "easier."

45.     Jennings also testified that there is no restriction on how the Debtor uses the "Darcy Allocation" — once the funds are transferred, the Debtor has, and always had, free rein on how she uses those funds:

| Counsel for the Trustee: | [A]s I understand it, over the last multiple years, Mr. Rice has paid money to Dash ta da Moon, LLC for living expenses of Darcy and what I will call maintenance of the Oregon property; is that correct? |
|---|---|
| Mr. Jennings: | Yes. |
| Counsel for the Trustee: | Okay.  Can you describe for me the process of literally how the payments were made, how the process worked?  Were invoices sent?  How did the process work? |
| Mr. Jennings: | Okay.  It has changed over the years.  But generally, the way it works is that Darcy turns in receipts for expenditures that she's had.  And during the early period after her divorce from Brian, Ron was just paying her expenses and the house expenses, you know, for the Oregon property.  And he would just reimburse her. |
| | Some expenses, he might pay directly, if it's a – if it's you know, property taxes or something like that.  But then over time, he – to better control what she was spending, he gave |

her an allocation so that any personal expenses that were not related to the house would reduce what she got. So if she was given an allocation of $50,000 a month, and she – and there were expenses of 20 that were paid by Ron, then she would only get 30, the balance of the 30 directly to her, or to Dash ta da Moon.

. . .

Counsel for the Trustee: Okay. So let's start back -- back in the early years. As I recall, Darcy testified that there was a $50,000 amount. So let's start. Is that correct? How did that work in the early years?

Mr. Jennings: Well, as I said, early, there was no fixed amount. She was spending money and, you know, I think there was some effort to try to control what she was spending, just to keep it down.

. . .

Counsel for the Trustee: And during the period – let's say where it was a $50,000-a-month cap -- did Darcy have the ability to just spend whatever she wanted to spend money on, on living expenses, whether it was going on vacation, going to get her nails done, whatever it may be?

Mr. Jennings: Once it became a – "a lot," then I think was the word Ron used or uses, I think he was less concerned about watching how it was going to be spent. So, yes, if she wanted to go on vacation as the example you gave, I think she could have just spent, out of that – that remaining allocation. And some -- a lot of Sterling's expenses were in that amount that Ron would have paid her back, also, if she had paid for clothing for Sterling or things of that nature.

Counsel for the Trustee: Okay. The expenses for Sterling, was that on -- in addition to the allocation to Darcy?

Mr. Jennings: Yes.

Counsel for the Trustee: And what if a particular month's actual expenses were less than $50,000 in the -- in the period where there is a $50,000 allocation? Would Mr. Rice still send the net 50,000 to Darcy or just the actual expense incurred?

| | |
|---|---|
| Mr. Jennings: | The net difference that she did not spend would have been sent to her.  So, in other words, if she had 50, had spent 30, she would get a check for 20. |
| Counsel for the Trustee: | And that money would just be, what, held by Darcy to use in the future, or what? |
| Mr. Jennings: | It was given to Darcy.  We did not track it once it was given to Darcy. |
| Counsel for the Trustee: | Okay.  So once the money was paid to Dash ta da Moon, LLC, example up to net of 50, Darcy could spend that net however she chose? |
| Mr. Jennings: | Yeah.  There were no restrictions, that I'm aware of, placed on it. |
| Counsel for the Trustee: | And did that process stay the same, even when the allocation was reduced to 20? In other words, the -- the net would have been paid to Darcy up to the cap, and then she could use it in the future or whatever she wanted to do with it? |
| Mr. Jennings: | Right. Obviously, now that the -- as the amounts -- as her allotment came down, the difference becomes much smaller. |
| Counsel for the Trustee: | Right. And did I understand that some of the house-related expenses would not be included within the monthly allotment to Darcy? |
| Mr. Jennings: | Well, like insurance and property taxes would not have been included. But the -- yes. |

46.     On January 16, 2012, the Debtor signed a promissory note in the amount of $1 million payable to Rice (the "Rice $1 Million Note").   Jennings testified in his Rule 2004 examination that $1 million was not extended to the Debtor at this time, but instead, the Rice $1 Million Note was created to evidence prior payments made by Rice (through the Darcy Allocations) to the Debtor for her living expenses (i.e. through Dash).  Thus, the Rice $1 Million Note was a purported "loan" to the Debtor, but the proceeds of the Rice $1 Million Note were deposited into a Dash Account.  The Rice $1 Million Note originally matured on December 31, 2012.  The day before the maturity date, the Rice $1 Million Note was amended to extend the

maturity date to June 1, 2014.  The day before the amended maturity date, Rice assigned the Rice $1 Million Note to the Debtor.

47.     As illustrated by the above testimony and other evidence to be adduced at trial, payments by Rice from 2010 through the present date are (and were) made to Dash for the Debtor's personal benefit as a means for the Debtor to hinder, delay, defraud, and avoid paying her creditors.

> **b)     *The Debtor has titled or acquired dozens of assets that she uses for her personal benefit in Dash's name to avoid seizure by her creditors***

48.     The Debtor has placed title to or otherwise acquired significant assets, including numerous vehicles, expensive quarter horses, and hundreds of thousands of dollars of cash in Dash's name so that she can claim she has no assets.  Upon information and belief, the purchase prices of the various assets acquired by Dash over the past decade were paid from the Darcy Allocation.  In fact, Debtor has testified that all deposits into the Dash Account over the past several years came from Rice.

49.     First, there are large barns on the Oregon Estate that house several horses registered with the American Quarter Horse Association.  The Debtor routinely rides these horses while barrel racing in rodeos.  Over the past decade, the Debtor has purchased dozens of horses and titled them in the name of Dash,[9] even though in her Rule 2004 examination she testified that "[t]hey're our family's horses."  Similarly, on social media and/or in the Rodeo Girls Show (as defined below), the Debtor and her daughter, Sterling, admitted certain horses titled in the name of Dash belong to the Debtor.  When asked during her Rule 2004 examination why Dash purchased a

---

[9] The quarter horses (there is also an additional non-quarter horse named Creepin Round) purportedly owned by Dash as of the Petition Date include, but are not limited to, horses named as follows:

- Rooster's Handyman
- Star War Cutter Lynx
- ChickBullyDashUS DL
- Beda Feature Me
- Dashin Medic
- Shootin Craps
- MP Vaqueros Star
- Letta Brother Do it

particular horse, the Debtor replied "[b]ecause we wanted to." She also indicated that she was planning to purchase three additional horses.

50.     Along with the horses, the barns store custom saddles and other horse tack and farm equipment, which can be seen in the Rodeo Girls Show and on the Debtor's various social media accounts. The Dash bank statements show the purchase of multiple saddles over the years. In her Rule 2004 examination, the Debtor testified that "[a] lot" of saddles were purchased by "Dash" for cash over the past five years.

51.     Several vehicles are titled in the name of Dash.[10]  During her Rule 2004 examination, when asked when and why a particular truck was purchased by Dash, the Debtor replied, "[a] couple years ago. We needed a truck so we bought a pickup truck." In 2016, the Debtor purchased a Cadillac Escalade using a check from a Dash Account. In her Rule 2004 examination, she indicated that she wrote the check herself and that "it was expensive." She also admitted that she drives the Escalade on a routine basis and that it is kept at the Oregon Estate. Throughout her Rule 2004 examinations, the Debtor testified "we have" or "we bought" vehicles titled in Dash's name. She also indicated that "*we*" are going to purchase a new tractor soon. When asked to clarify whether that meant that ***Dash*** would be purchasing the tractor, she replied in the affirmative. The Debtor clearly equates Dash with herself and treats its assets as her own.

52.     The Debtor also indicated that Dash purchased vehicles for her adult children. For instance, she indicated that "we as in" Dash wrote a check for a 2011 BMW that is registered in the name of Sterling Rice, her oldest child, and for a 2015 Subaru that is in the name of her son,

---

[10] The vehicles titled in the name of Dash as of the Petition Date include, but are not limited to, the following:

- 2006 Platinum trailer; plate no. U465657
- 2008 Bloomer trailer; plate no. R852115
- 2016 Cadillac Escalade; plate no. 400GDW
- 2015 Ford pickup; plate no. TURNBN
- 2007 Freightliner; plate no. F169200
- 2015 Bloomer trailer; plate no. HV00725
- 2004 Eagle utility trailer; plate no HS93142

Nicolas.

53.     As of the Petition Date, the Dash Accounts held funds in the approximate amounts of $114,476.78 (account number ending in 5008) and $622.95 (account number ending in 5867), respectively.

54.     Millions of dollars have been (a) transferred between, (b) deposited into, and (c) withdrawn from the Dash Accounts over the last several years.  At least some of the deposits are transfers from Rice to the Debtor via the Darcy Allocations.  However, it appears that a significant number of deposits have been made to the Dash Accounts over the past four (4) or five (5) years that appear to have originated from a source other than Rice, which the Debtor cannot adequately explain.  Furthermore, the Debtor cannot sufficiently explain virtually any of the cash withdrawals from the Dash Accounts.

55.     Payments out of the Dash Accounts are made for the Debtor's personal expenses and the personal expenses of her children (including adult children).  For example only, the following categories of goods, services, and fees were paid out of the Dash Accounts:

- Saddles
- Fast Food
- Criminal attorney fees
- Photoshoots
- Barrel racing entry fees
- Paintings
- Expenses relating to the *Rodeo Girls* show
- Netflix charges

- Speeding tickets
- Plastic surgery
- Hair styling
- Goods from Prada
- Goods from Z Gallerie
- Limousines
- Retainer to Debtor's bankruptcy counsel
- Goods from Nordstrom and other retailers

- Personal Styling
- Public Relations services
- Vehicles
- Vacation travel
- Goods from Victoria's Secret
- Horses, including maintenance
- College tuition for Debtor's adult children
- Payments to Debtor's pre-bankruptcy counsel

56.     The Debtor's intent to use Dash to shield her assets from creditors is also shown by her deception regarding Dash.  Besides her statements in her Rule 2004 examination, on June 23,

2015, Sterling Bank conducted a deposition of the Debtor.  At that deposition, the Debtor made

the following false, misleading, and/or inconsistent statements, among others:

> a.  The Debtor claimed she did not have an interest in Dash and that she had "no idea" what the name of Dash was or who came up with the name.  (We now know that she created the entity herself and named it after one of her horses).
>
> b.  The Debtor stated that she thought Dash was dissolved and that Dash does not file tax returns "because there's no money made or profit or anything like that."
>
> c.  The Debtor testified that both she and Rice manage the expenses and the treatment of the expenses that are run through Dash.
>
> d.  When asked if Dash has a bank account, the Debtor pivoted and responded, "I'll ask [Ron's bookkeeper]."  When her attorney stepped in and responded that Dash does, in fact have a bank account, the Debtor replied, "Okay. Right, yes, yes" and then stated that she had no documents related to the bank account.
>
> e.  The Debtor testified that Dash was set up to take care of the Oregon Estate.
>
> f.  The Debtor testified that the amount of money in Dash's bank account was "$10,000, $8,000.  Not too much."
>
> g.  The Debtor testified that there were only three horses at the Oregon Estate, a "draft horse," an "old rope horse," and "a baby horse."  She stated that she does not rodeo using any horses that are owned by her, Dash, or Rice.  Based upon records from the American Quarter Horse Association, we know that Dash owned at least three quarter horses at the time of this exam, all of which the Debtor rode in rodeos.

57.    Furthermore, the Debtor did not include any of the assets titled in Dash's name or

purchased with funds from the Dash Accounts in her bankruptcy Schedules.  She also did not

disclose her interest in Dash (or the Dash Accounts) in her Schedules.  The only mention of Dash

in the Debtor's bankruptcy documents is in her SOFA, where she admits that she is the

manager/registered agent of Dash and claims the nature of Dash's business is "Horse Farm."

58.    In sum, the Debtor has, at all relevant times, (i) completely dominated and

controlled the assets, operations, activities, policies, programs, procedures, strategies, and tactics

of Dash, such that Dash has no independent existence; (ii) failed to observe necessary corporate

formalities with respect to Dash; (iii) used Dash's assets for her personal affairs and purposes, as if those assets belong to the Debtor personally; and (iv) used Dash for a fraudulent and improper purpose (*i.e.*, to hinder, delay, and defraud the Debtor's creditors). Dash is no more than the Debtor's personal slush fund. As a result, any adherence to the fiction of the existence of Dash as an entity separate and distinct from the Debtor would permit an abuse of corporate or similar privilege of limited liability, if any, and would promote injustice by allowing the Debtor to evade liability or conceal assets in Dash that should be used for the benefit of, and to administer, the Debtor's bankruptcy estate.

III.    **THE DEBTOR HAS FULL CONTROL OVER BARN DOOR AND USES IT IN AN ATTEMPT TO SHIELD HER ASSETS FROM HER CREDITORS**

    A.    **The Debtor has full control over Barn Door**

59.    On March 10, 2010, the Debtor formed Barn Door by filing Articles of Organization with the Oregon Secretary of State. The Debtor and her oldest daughter, Sterling Rice (who was 20 years old at the time of formation), were listed as organizers. Sterling, along with the Debtor's other two children (who were 14 and 7 years old, respectively), were listed as members. Barn Door was manager-managed, and the Debtor was listed as the sole manager and the registered agent.

60.    The Debtor testified in her Rule 2004 examination that she had a debit card for and the authority to write checks and withdraw funds from Barn Door's bank account.

61.    In his Rule 2004 examination, Jennings testified that Rice has never had an interest in Barn Door and that he was not aware of Rice owning an interest in any assets titled in Barn Door's name. Similarly, in Rice's Rule 2004 examination, Rice testified that he had never heard of Barn Door and was not affiliated in any way with Barn Door.

**B.    The Debtor uses her control over Barn Door to engage in improper conduct that is harmful to her creditors**

    **i.    Barn Door does not have legitimate business operations**

62.    The Debtor testified that, like Dash, Barn Door "just sits" and that she "believe[s] it's dissolved."  In explaining why Barn Door was created, she stated that "[i]t was just started and stopped, thinking we would buy and sell horses through there with – you know, and make family business and that, but it just sat there."

63.    Between approximately December 11, 2013 and January 9, 2014, the Debtor appeared in a "reality" television show on the A&E Television Network titled *Rodeo Girls* (the "Rodeo Girls Show").  In connection with her appearance in the Rodeo Girls Show, the Debtor entered into an agreement with the Weinstein Company on September 20, 2011 through a non-existent entity named Barn Door, LLC (the "Rodeo Girls Contract").[11]  In the event the inclusion of "Barn Door, LLC" was a scrivener's error and the true contracting entity was Barn Door, the later entity is an alter ego of the Debtor as discussed herein.

64.    In her Rule 2004 examination, the Debtor testified that Barn Door never had any assets or contracts, involvement with the Rodeo Girls Show, or books and records.  She further testified that Barn Door never had business operations and that she did not think it ever had a bank account or filed tax returns.[12]

65.    On May 9, 2014, Barn Door was administratively dissolved by the State of Oregon and has not been reinstated.

---

[11] The Debtor has repeatedly testified that she never entered into or signed a contract in connection with the Rodeo Girls Show.

[12] As indicated below, the Debtor produced bank statements showing that Barn Door does have a bank account.

### ii.    Barn Door is used solely for the personal benefit of the Debtor and to keep her assets out of the hands of her creditors

66.    Barn Door, like Dash, was created and used solely for the personal benefit of the Debtor.  Furthermore, as Barn Door was dissolved by the State of Oregon in the year 2014 and remains dissolved to date, all assets in the name of Barn Door are, in reality, the assets of the Debtor.  The Debtor failed to include any mention of Barn Door or its assets (including the Barn Door Account) on her Schedules or SOFA.  Like Dash, the Debtor organized Barn Door in order to hinder, delay, and defraud creditors and to hide assets at time when she owed tens of millions of dollars to creditors.

67.    Over the past several years, hundreds of thousands of dollars have been transferred to and withdrawn from a U.S. Bank, N.A. account in the name of Barn Door (account number ending in 1709) (the "Barn Door Account"), which held, as of the Petition Date, approximately $620.38.  Hundreds of thousands or perhaps millions, of dollars were transferred from the Barn Door Account into the Dash Accounts over the years.

68.    The Oregon Estate contains a guesthouse that, although currently vacant, the Debtor previously rented out.  Rent from the guesthouse was deposited into the Barn Door Account.  Jennings testified at his Rule 2004 exam that Rice did not enter into a lease with respect to the guesthouse, nor did he receive rent from the prior tenant.  Thus, the Debtor was the recipient of the rent and used it for her personal benefit.

69.    In her Rule 2004 examination, and as shown in the bank statements that were produced to the Trustee, the Debtor admitted that funds from the Barn Door Account were used for personal living expenses, like Uber trips, Urban Outfitters clothing, saddles, shopping trips out of town, and fuel.  She testified that there was no particular reason for funds to be used from the Barn Door Account rather than the Dash Accounts.

## IV.    IN HER OWN WORDS, THE DEBTOR AND THE TRUST "ARE THE SAME THING"

70.     The Debtor executed that certain 2003 Amendment and Restatement of Revocable Living Trust Agreement, dated April 22, 2003, in her capacity as both trustor and trustee for the Trust.  The Trust was fully revocable by the Debtor as trustee during her life.  At all relevant times, the Debtor was the trustee and beneficiary of the Trust and had sole control on all matters relating to the Trust.  Pursuant to the terms of the Trust, the Debtor, as trustee, was obligated to "distribute to or for the benefit of" herself, as trustor, "such portions of the income and principal of the [T]rust" she, as trustor, requested.

71.     On May 16, 2007, for no consideration, the Debtor transferred the Oregon Estate from the Trust to herself, individually.  Just seven days later, again for no consideration, the Debtor then transferred the Oregon Estate back to the Trust.

72.     In her Rule 2004 examination, the Debtor stated that she and the Trust are "the same thing."  The Trust was revocable, self-settled, and has allegedly been dissolved as it allegedly had no assets.  All of the assets in the name of or acquired by the Trust at any point in time were actually assets of the Debtor.

## COUNT I

## Declaratory Judgment - Alter Ego

73.     The Trustee re-alleges and incorporates the preceding paragraphs as if set forth fully herein.

74.     Dash, Barn Door, and the Trust (collectively, the "Non-Debtor Defendants") were and are actually controlled by the Debtor.  The separateness of the Non-Debtor Defendants from the Debtor is a legal fiction that should be disregarded.

75.     The Debtor used her control over the Non-Debtor Defendants to engage in improper conduct.  The sole reason that the Debtor's assets were titled in the respective names of the Non-Debtor Defendants is to attempt to shield the Debtor's assets from her rightful creditors.  The Debtor has acted dishonestly and deceitfully for the past decade when questioned about her assets.

76.     As a result of the Debtor's improper conduct, the Debtor's creditors have been unable to collect on their judgments for the past decade and were thus indisputably harmed.

77.     There is an actual controversy between the parties on this issue.

78.     Accordingly, pursuant to 28 U.S.C. § 2201 and Federal Rule of Bankruptcy Procedure 7001, the Trustee is entitled to a declaratory judgment that each of the Non-Debtor Defendants are, and have always been, the alter egos of the Debtor.

## COUNT II

### Declaratory Judgment -
### All Assets of the Non-Debtor Defendants are Property of the Estate

79.     The Trustee re-alleges and incorporates the preceding paragraphs as if set forth fully herein.

80.     As of the Petition Date, the Debtor had the right to use, enjoy, and control all of the assets of the Non-Debtor Defendants for her personal benefit, without restriction.  Furthermore, in her Schedules, the Debtor admitted that the amounts she receives from Rice, referred to above as the "Darcy Allocations," are her income.  Testimony from the Rule 2004 examinations of the Debtor, Rice, and Jennings indicate that payments from Rice were made to one of the Non-Debtor Defendants merely due to the Debtor's request, rather than through a business relationship between Rice and Dash.

81.     There is no restriction on the Debtor's ability to (a) transfer assets to, (b) transfer title of assets from, (c) or otherwise dispose of property in the name of the Non-Debtor Defendants.

82.     The Debtor is the manager and registered agent for Dash and Barn Door.  She also serves as trustee for the Trust and is a beneficiary of the Trust.  Moreover, Barn Door and the Trust may have been dissolved, thereby leaving no doubt that the Debtor owns all assets in their respective names or acquired with "their" funds, and is liable for their respective debts.

83.     Property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case."  11 U.S.C. § 541(a).  The Debtor has legal and/or equitable interests in the assets of the Non-Debtor Defendants.  Accordingly, the Non-Debtor Defendants and all of their respective assets, including all assets in their names, as of the Petition Date, are property of the estate.

84.     There is an actual controversy between the parties on this issue.

85.     Thus, pursuant to 28 U.S.C. § 2201 and Federal Rule of Bankruptcy Procedure 7001, the Trustee requests that the Court enter a declaratory judgment that the Non-Debtor Defendants and all of the assets in their respective names or purchased or otherwise acquired by funds from "their" bank accounts, including, but not limited to, those assets listed on the schedules attached hereto and the assets in footnotes 9 and 10 herein, as of the Petition Date, are property of this bankruptcy estate.[13]

## COUNT III

## Turnover — 11 U.S.C. § 542(a) and (e)

86.     The Trustee re-alleges and incorporates the preceding paragraphs as if set forth fully herein.

---

[13] To the extent the Trustee determines during discovery that certain assets listed in the schedules attached hereto were not owed by or titled in the name of one of the Non-Debtor Defendants as of the Petition Date, the Trustee will not seek a remedy against those assets under this cause of action.

87.     Section 542(a) of the Bankruptcy Code provides:

> Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

11 U.S.C. § 542(a).

88.     The Trustee seeks, pursuant to 11 U.S.C. § 542(a), turnover of all of the assets of the Non-Debtor Defendants and the Debtor not claimed as exempt in Debtor's bankruptcy case as of the Petition Date.

89.     The Debtor has legal and/or equitable interests in the Non-Debtor Defendants and all of the assets in their possession, custody, or control.  As a result, all property held by the Non-Debtor Defendants as of the Petition Date is property of the Debtor's bankruptcy estate.

90.     The Trustee may use or sell the assets of the Non-Debtor Defendants pursuant to 11 U.S.C. § 363.

91.     The assets in the possession, custody, or control of the Non-Debtor Defendants have value and would otherwise benefit the Debtor's estate.

92.     Accordingly, the Debtor and the Non-Debtor Defendants should be ordered, pursuant to 11 U.S.C. § 542(a), to deliver and account for all property of the Debtor's estate, including, but not limited to, those assets listed on the schedules attached hereto and in footnotes 9 and 10 herein, or the value of such property.[14]

93.     As authorized by 11 U.S.C. §542(e), the Trustee also requests that the Court enter a judgment requiring the Non-Debtor Defendants and the Debtor to turn over to the Trustee all of

---

[14] To the extent the Trustee determines during discovery that certain assets listed in the schedules attached hereto were not owed by or titled in the name of one of the Non-Debtor Defendants as of the Petition Date, the Trustee will not seek a remedy against those assets under this cause of action.

their respective recorded information, including books, documents, records, and papers relating to their respective property and financial affairs.

## COUNT IV

## Declaratory Judgment - Nominee

94.     The Trustee re-alleges and incorporates the preceding paragraphs as if set forth fully herein.

95.     The Non-Debtor Defendants are each a nominee of the Debtor.

96.     The Non-Debtor Defendants did not pay consideration to the Debtor (i) for the funds deposited into bank accounts in their respective names and (ii) for assets acquired in or transferred into their respective names.

97.     All of the property placed in the name of or purchased or otherwise acquired by the Non-Debtor Defendants was so placed or acquired in anticipation of litigation and/or to avoid the Debtor's liabilities.  At the time Dash and Barn Door were created, creditors of the Debtor held judgments totaling millions of dollars.  The Debtor created Dash and Barn Door to hold the Debtor's assets in an attempt to keep them out of the hands of her creditors.

98.     The Debtor maintains complete control of, and a close relationship with, each of the Non-Debtor Defendants and their respective members and assets.  The Debtor served and currently serves as manager and registered agent for Dash and Barn Door, and as trustee of the Trust.  Additionally, the Debtor is the biological mother to all other members of Dash and Barn Door.

99.     The Debtor has complete control over all of the assets in the respective names of or purchased or otherwise acquired by the Non-Debtor Defendants.  All of these tangible assets are kept on the Oregon Estate — where the Debtor lives and has lived since 2004.  The Debtor does

not pay rent for the use of any of the assets in the respective names of or purchased or otherwise acquired by the Non-Debtor Defendants. She also holds herself out as the owner of all of the assets of the Non-Debtor Defendants, as shown in the Rodeo Girls Show.

100. Other than bank statements, there are little or no records of the transfers between the Non-Debtor Defendants and the Debtor. The Trustee has repeatedly requested documents detailing the transactions among the Debtor and the Non-Debtor Defendants, and the Debtor has testified that none exist other than those produced to the Trustee.

101. At all relevant times, the Debtor retained possession of and continues to enjoy the benefits of all of the assets titled in the name of, or purchased or otherwise acquired by, and transferred among, the Non-Debtor Defendants, all of which should have been retained in her name, individually. All of the assets of Dash, Barn Door, and the Trust (including money in bank accounts, horses, and vehicles) are used for the Debtor's personal benefit and for her personal expenses, without restriction.

102. As the Trust is self-settled and revocable, the Debtor has both legal and equitable title to all of the Trust's assets. Additionally, since Barn Door has (and the Trust may have) been administratively dissolved, there is no longer a corporate form and all of the assets in its name belong to its manager — the Debtor.

103. Thus, pursuant to 28 U.S.C. § 2201 and Federal Rule of Bankruptcy Procedure 7001, the Trustee requests that the Court enter a declaratory judgment that Dash, Barn Door, and the Trust are nominees of the Debtor.

## COUNT V

## Accounting

104.     The Trustee re-alleges and incorporates the preceding paragraphs as if set forth fully herein.

105.     The Debtor holds legal and/or equitable interests in the Non-Debtor Defendants and their respective assets.

106.     A fiduciary relationship exists between the Debtor and the Non-Debtor Defendants. The Debtor serves as manager and registered agent for both Dash and Barn Door, and is the trustee of the Trust.  Each of these positions imparts a fiduciary relationship.

107.     Prior to the Petition Date, the Debtor transferred, received, and spent millions of dollars of money and assets through the Non-Debtor Defendants.  The details of these transfers, which transpired over the past decade, are extremely complex, and the Trustee is unable to determine the full extent of these transfers at present.  There is not an adequate remedy at law to provide clear insight into each of these transactions.

108.     As a result of these transfers, the Trustee holds a claim against the Non-Debtor Defendants in the collective amount of the transfers made to the Non-Debtor Defendants by or at the direction of the Debtor.

109.     An accounting of (a) the assets (i) in the respective names of, (ii) owned by, or (iii) in the possession, custody, or control of the Non-Debtor Defendants; and (b) all financial transactions of the Non-Debtor Defendants, is warranted to ascertain the amounts that the Non-Debtor Defendants owe to the Debtor's bankruptcy estate.

110.     Accordingly, the Trustee requests that the Court order the Debtor and the Non-Debtor Defendants to provide the accounting requested herein.

## COUNT VI

## Constructive Trust

111.    The Trustee re-alleges and incorporates the preceding paragraphs as if set forth fully herein.

112.    Prior to the Petition Date, the Debtor fraudulently transferred, received, and spent millions of dollars of money and assets through the Non-Debtor Defendants.  The funds deposited into bank accounts in the respective names of the Non-Debtor Defendants, and then used to purchase assets, are funds in which the Debtor has a legal and/or equitable interest.

113.    The Debtor maintains control of, and a close relationship with, each of the Non-Debtor Defendants and their respective members.  The Debtor served and currently serves as manager and registered agent for Dash and Barn Door, and as trustee of the Trust.  Additionally, the Debtor is the biological mother to all other members of Dash and Barn Door.

114.    The Non-Debtor Defendants were unjustly enriched by the funds and other assets that they received, based on principles of justice, equity, and good conscience.  It is inequitable for the Non-Debtor Defendants to retain the assets at the expense of the Debtor's creditors.  The transfers to the Non-Debtor Defendants caused them to receive money that belonged to the bankruptcy estate for not reasonably equivalent exchange.  It would be fundamentally unfair and an abuse of confidence to allow the Non-Debtor Defendants to retain funds and other assets truly belonging to the bankruptcy estate while the Debtor's defrauded creditors seek to recover on their claims.

115.    The Debtor admitted that all deposits into the Dash and Barn Door accounts were funds paid by Rice and were thus funds paid to the Debtor solely for her personal benefit.  As a result, the Trustee requests that the Court impose a constructive trust on the assets of the Non-

Debtor Defendants, including, but not limited to, all of the assets listed on the schedules attached hereto,[15] all property purchased or otherwise acquired by the Non-Debtor Defendants, and the assets in footnotes 9 and 10 herein, as of the Petition Date, such that they can be disgorged and paid to the Trustee to enable the bankruptcy estate to satisfy its obligations to the Debtor's creditors.  All of the assets of the Non-Debtor Defendants are specific and identifiable and/or (with appropriate document production) can be clearly traced.  Further, the Court should prevent any distributions or funds whatsoever to be paid from the bank accounts in the respective names of the Non-Debtor Defendants until such time as this lawsuit is finally resolved and all property of the estate has been distributed.

## COUNT VII

### Declaratory Judgment - Self-Settled Trust

116.    The Trustee re-alleges and incorporates the preceding paragraphs as if set forth fully herein.

117.    At all relevant times, the Debtor was the trustor, beneficiary, and trustee of the Trust.  The Trust was fully revocable by the Debtor during her lifetime, and the Debtor had sole control on all matters relating to the Trust.  Pursuant to the terms of the Trust, the Debtor, as trustee, was obligated to "distribute to or for the benefit of" herself, as trustor, "such portions of the income and principal of the [T]rust" she, as trustor, requested.

118.    The Trust may be disregarded by the Debtor's creditors as a self-settled trust.

119.    Accordingly, pursuant to 28 U.S.C. § 2201 and Federal Rule of Bankruptcy Procedure 7001, the Trustee is entitled to a declaratory judgment that (i) the Trust has at all relevant

---

[15] To the extent the Trustee determines during discovery that certain assets listed in the schedules attached hereto were not owned by or titled in the name of one of the Non-Debtor Defendants as of the Petition Date, the Trustee will not seek a remedy against those assets under this cause of action.

times been a self-settled trust, (ii) the Trust's assets shall be included in the Debtor's bankruptcy estate to pay Debtor's creditors, and (iii) at all times any assets of the Trust were in reality the assets of the Debtor.

## COUNT VIII

### Actual Fraudulent Transfer - 11 U.S.C. §§ 548(a)(1)(A) and 550

120.    The Trustee re-alleges and incorporates the preceding paragraphs as if set forth fully herein.

121.    The Debtor transferred the following property to the Non-Debtor Defendants within two (2) years prior to the Petition Date:

      a.      At least $960,158.73 in cash, as set forth in greater detail on Schedule 1.1, attached hereto;

      b.      Horses, as set forth in greater detail in Schedule 2.1, attached hereto;

      c.      Vehicles, as set forth in greater detail in Schedule 3.1, attached hereto; and

      d.      All other property in the possession, custody, or control of the Non-Debtor Defendants.

(collectively, the "548 Transfers").

122.    The 548 Transfers were "transfers" of an interest of the Debtor in property as defined in section 101(54) of the Bankruptcy Code.

123.    The 548 Transfers were made on or within two (2) years before the Petition Date.[16]

124.    The Debtor made the 548 Transfers with actual intent to hinder, delay or defraud the creditors to which the Debtor was or became, on or after the date that each such transfer was

---

[16] To the extent the Trustee determines during discovery that certain assets listed in the schedules attached hereto were not owed by or titled in the name of one of the Non-Debtor Defendants within two years prior to the Petition Date, the Trustee will not seek a remedy against those assets under this cause of action.

made, indebted.  The Debtor's intent to hinder, delay or defraud may be inferred by, among other things, the following extrinsic evidence:

a.  the Debtor was insolvent in the spring of 2008 and all times thereafter and has been planning this bankruptcy filing since at least 2012;

b.  the Debtor has continued to retain possession and use of, and benefit from, all assets of the Non-Debtor Defendants;

c.  the Debtor has concealed the assets of the Non-Debtor Defendants from her creditors;

d.  the Non-Debtor Defendants are insiders of the Debtor;

e.  the Debtor transferred, or caused to be transferred, the property for less than reasonably equivalent value; and

f.  the Debtor's general scheme or course of conduct of incurring debt, onset of financial difficulties, pendency or threat of litigation by creditor(s), and failure to pay anything toward the judgment debt holders and other creditors.

125.   The Non-Debtor Defendants were the initial transferees of the 548 Transfers.

126.   In the alternative, the Non-Debtor Defendants were the immediate or mediate transferees of the 548 Transfers.

127.   Accordingly, pursuant to section 548(a)(1)(A) and 550 of the Bankruptcy Code, the 548 Transfers alternatively constitute avoidable fraudulent transfers.  The Trustee is entitled to a judgment avoiding and recovering the 548 Transfers or the value of the 548 Transfers from the Non-Debtor Defendants for the benefit of the Debtor's bankruptcy estate.

## COUNT IX

### Actual Fraudulent Transfer - 11 U.S.C. § 544(b)(1) and O.R.S. § 95.230(1)(a)

128.   The Trustee re-alleges and incorporates the preceding paragraphs as if set forth fully herein.

129.     Pursuant to section 544(b)(1) of the Bankruptcy Code, the Trustee may avoid any transfer of any interest of the Debtor in property that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of the Bankruptcy Code.

130.     As of the Petition Date, there were creditors holding over thirty-five million dollars of unsecured claims against the Debtor that are allowable under section 502 of the Bankruptcy Code.  Such creditors include, but are not limited to (i) Indymac Bank, with a claim of $16,273,576.12; (ii) Wireless Receivables Acquisition Group, LLC, with a claim of $11,658,929.99; and (iii) Lamplight Capital & Asset Management, LLC, with a claim of $4,539,375.67.  Each of these creditors (or their assignors) held judgments against the Debtor prior to the time of the State Law Transfers (defined below).

131.     Chapter 95 of the Oregon Revised Statues, O.R.S. §§ 95.200 – 95.310, known as the Oregon Uniform Fraudulent Transfer Act (the "Oregon UFTA"), is applicable herein by virtue of section 544(b) of the Bankruptcy Code.[17]

132.     Within four (4) years prior to the Petition Date, the Debtor transferred to the Non-Debtor Defendants her interest in, among other things:

    a.      At least $2,148,595.88 in cash, as set forth in greater detail in Schedule 1.2, attached hereto;

    b.      Horses, as set forth in greater detail in Schedule 2.2, attached hereto;

    c.      Vehicles, as set forth in greater detail in Schedule 3.2, attached hereto; and

---

[17] The Non-Debtor Defendants are residents of Oregon. To the extent a question exists regarding which state's fraudulent transfer law applies, Florida's choice of law rules govern. *In re Palm Beach Fin. Partners, L.P.*, 09-36379-BKC-PGH, 2014 WL 12498025, at *4 (Bankr. S.D. Fla. Dec. 10, 2014). Since both Oregon and Florida have adopted the Uniform Fraudulent Transfer Act, the Trustee does not believe that a true conflict exists between Oregon and Florida law, and Oregon law applies because it is the state where the transferees have their domicile and/or principal place of business. However, to the extent it is later determined that Florida law applies, the Trustee makes the same allegations pursuant to the analogous provisions of Fla. Stat. §§ 726.101 – 726.201 (the "Florida UFTA").

      d.      All other property in the possession, custody or control of the Non-Debtor Defendants.

(collectively, the "State Law Transfers").

133.    The State Law Transfers were "transfers" as defined in section 200(12) of the Oregon UFTA.

134.    The State Law Transfers were made within four (4) years of the Petition Date.[18]

135.    The Debtor made the State Law Transfers with actual intent to hinder, delay, or defraud the creditors to which the Debtor was or became indebted, on or after the date that each such transfer occurred.  The Debtor's intent to hinder, delay, or defraud may be inferred by, among other things, the following extrinsic evidence:

      a.      the Debtor was insolvent in spring of 2008 and all times thereafter and has been planning this bankruptcy filing since at least 2012;

      b.      the Debtor has continued to retain possession and use of, and benefit from, all assets of the Non-Debtor Defendants;

      c.      the Debtor has concealed the assets of the Non-Debtor Defendants from her creditors;

      d.      the Non-Debtor Defendants are insiders of the Debtor;

      e.      the Debtor transferred, or caused to be transferred, the property for less than reasonably equivalent value; and

      f.      the Debtor's general scheme or course of conduct of incurring debt, onset of financial difficulties, pendency or threat of litigation by creditor(s), and failure to pay anything toward the judgment debt holders and other creditors.

136.    Pursuant to section 260 of the Oregon UFTA, the Trustee may recover judgment against the Non-Debtor Defendants in the amount of the State Law Transfers, as the Non-Debtor

---

[18] To the extent the Trustee determines during discovery that certain assets listed in the schedules attached hereto were not owned by or titled in the name of one of the Non-Debtor Defendants within four years prior to the Petition Date, the Trustee will not seek a remedy against those assets under this cause of action.

Defendants were each the first transferee or subsequent transferee of one or more of the State Law Transfers.

137.    Accordingly, the Trustee alternatively asserts that the State Law Transfers constitute avoidable fraudulent transfers under the Oregon UFTA.  The Trustee is entitled to a judgment pursuant to sections 230(1)(a) and 260 of the Oregon UFTA avoiding the State Law Transfers, and recovering the value of the State Law Transfers.

## COUNT X

## Constructive Fraudulent Transfer - 11 U.S.C. §§ 548(a)(1)(B) and 550

138.    The Trustee re-alleges and incorporates the preceding paragraphs as if set forth fully herein.

139.    Prior to the Petition Date, the Debtor made the 548 Transfers to the Non-Debtor Defendants.  The 548 Transfers were "transfers" of an interest of the Debtor in property as defined in section 101(54) of the Bankruptcy Code.

140.    The 548 Transfers were made on or within two (2) years before the Petition Date.[19]

141.    The Debtor made the 548 Transfers without receiving reasonably equivalent value in exchange for such transfers, and the Debtor was insolvent at the time the 548 Transfers were made or became insolvent as a result of the 548 Transfers.

142.    The Non-Debtor Defendants were the initial transferees of the 548 Transfers.

143.    In the alternative, the Non-Debtor Defendants were the immediate or mediate transferees of the 548 Transfers.

---

[19] To the extent the Trustee determines during discovery that certain assets listed in the schedules attached hereto were not owned by or titled in the name of one of the Non-Debtor Defendants within two years prior to the Petition Date, the Trustee will not seek a remedy against those assets under this cause of action.

144.     Accordingly, pursuant to section 548(a)(1)(B) and 550 of the Bankruptcy Code, the 548 Transfers alternatively constitute avoidable fraudulent transfers.  The Trustee is entitled to a judgment avoiding and recovering the 548 Transfers or the value of the 548 Transfers, from the Non-Debtor Defendants for the benefit of the Debtor's bankruptcy estate.

## COUNT XI

### Constructive Fraudulent Transfer –
### 11 U.S.C. § 544(b)(1) and O.R.S. §§ 95.230(1)(b) and 95.240

145.     The Trustee re-alleges and incorporates the preceding paragraphs as if set forth fully herein.

146.     Pursuant to section 544(b)(1) of the Bankruptcy Code, the Trustee may avoid any transfer of any interest of the Debtor in property that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of the Bankruptcy Code.

147.     As of the Petition Date, there were creditors holding over thirty-five million dollars of unsecured claims against the Debtor that are allowable under section 502 of the Bankruptcy Code.   Such creditors include, but are not limited to (i) Indymac Bank, with a claim of $16,273,576.12; (ii) Wireless Receivables Acquisition Group, LLC, with a claim of $11,658,929.99; and (iii) Lamplight Capital & Asset Management, LLC, with a claim of $4,539,375.67.  Each of these creditors (or their assignors) held judgments against the Debtor prior to the time of the State Law Transfers (defined below).

148.     Oregon UFTA is applicable herein by virtue of section 544(b) of the Bankruptcy Code.[20]

---

[20] As set forth more fully in footnote 17, to the extent it is later determined that Florida law applies, the Trustee makes the same allegations pursuant to the analogous provisions of Florida UFTA.

149.    Prior to the Petition Date, the Debtor made the State Law Transfers to the Non-Debtor Defendants, which constitute "transfers" as defined in section 200(12) of the Oregon UFTA.

150.    The State Law Transfers were made within four (4) years of the Petition Date.[21]

151.    The Debtor made the State Law Transfers without receiving a reasonably equivalent value in exchange for such transfers, and the Debtor was insolvent at the time the State Law Transfers were made or became insolvent as a result of the State Law Transfers.

152.    Pursuant to section 260 of the Oregon UFTA, the Trustee may recover judgment against the Non-Debtor Defendants in the amount of the State Law Transfers, as the Non-Debtor Defendants were each the first transferee or subsequent transferee of one or more of the State Law Transfers.

153.    Accordingly, the State Law Transfers alternatively constitute avoidable fraudulent transfers under the Oregon UFTA.  The Trustee is entitled to a judgment pursuant to sections 230(1)(a) and 260 of the Oregon UFTA avoiding the State Law Transfers, and recovering the value of the State Law Transfers.

## CONCLUSION

WHEREFORE, the Trustee respectfully requests that this Court enter judgment in her favor, and against the Defendants, as follows:

I.    Declaratory judgment, pursuant to 28 U.S.C. § 2201 and Federal Rule of Bankruptcy Procedure 7001, that each of the Non-Debtor Defendants are the alter egos of the Debtor (and have been at all times);

II.    Declaratory judgment, pursuant to 28 U.S.C. § 2201 and Federal Rule of Bankruptcy Procedure 7001, that the Non-Debtor Defendants and all of their

---

[21] To the extent the Trustee determines during discovery that certain assets listed in the schedules attached hereto were not titled in the name of one of the Non-Debtor Defendants within four years prior to the Petition Date, the Trustee will not seek a remedy against those assets under this cause of action.

respective assets including all assets in their respective names are property of this bankruptcy estate;

III.    Ordering, pursuant to 11 U.S.C. §§ 542(a) and (e), that the Debtor and the Non-Debtor Defendants deliver and account to the Trustee for all property of the Debtor's estate, including that in the name of the Non-Debtor Defendants and turn over to the Trustee all of their respective recorded information, including books, documents, records, and papers relating to their respective property and financial affairs;

IV.    Declaratory judgment, pursuant to 28 U.S.C. § 2201 and Federal Rule of Bankruptcy Procedure 7001, that Dash, Barn Door, and the Trust are nominees of the Debtor;

V.    Requiring an accounting (a) of the assets in the respective names of the Non-Debtor Defendants, or owned by or in their possession, custody or control, and (b) all financial transactions of the Non-Debtor Defendants is warranted to ascertain the amount that the Non-Debtor Defendants owes to the Debtor's bankruptcy estate;

VI.    Imposing a constructive trust on all the assets of the Non-Debtor Defendants;

VII.    Judgment, pursuant to 28 U.S.C. § 2201 and Federal Rule of Bankruptcy Procedure 7001, that (a) the Trust has at all relevant times been a self-settled trust, (b) the Trust's assets must be included in the Debtor's bankruptcy estate to pay Debtor's creditors, and (c) at all times any assets of the Trust were in reality the assets of the Debtor;

VIII.    Alternatively, avoiding, preserving, and recovering the 548 Transfers and the State Law Transfers for the benefit of the Debtor's bankruptcy estate; and

IX.    Such other and further relief as the Court deems just and proper, including costs and attorney's fees.


*[Intentionally left blank--signature page follows.]*

Respectfully submitted this 23rd day of May, 2019.

**GRAY REED & McGRAW LLP**

By: */s/ Micheal W. Bishop*

    Micheal W. Bishop (*pro hac vice*)
    Texas Bar No. 02354860
    Lydia R. Webb (*pro hac vice*)
    Texas Bar No. 24083758
    Amber M. Carson (*pro hac vice*)
    Texas Bar No. 24075610
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone:  (214) 954-4135
Facsimile:  (214) 953-1332
Email:        mbishop@grayreed.com
              lwebb@grayreed.com
              acarson@grayreed.com

           **-** and **–**

**M. E. HENKEL, P.A.**

    Kristen Laurel Henkel
    Florida Bar No. 81858
3560 S. Magnolia Ave.
Orlando, Florida 32806
Telephone: (407) 438-6738
Facsimile: (407) 858-9466
Email:        khenkel@mehenkel.com

**SPECIAL COUNSEL TO THE TRUSTEE**

# SCHEDULE 1.1

## Cash Transfers
### (on or within two years before the Petition Date)

| Date of Transfer | Amount of Transfer | Date of Transfer | Amount of Transfer |
|---|---|---|---|
| 7/6/2016 | $48,675.34* | 9/28/2017 | $21,015.64* |
| 7/25/2016 | $42,016.18* | 9/28/2017 | $515.00† |
| 8/8/2016 | $46,431.18* | 10/2/2017 | $3,600.00* |
| 9/6/2016 | $46,233.27* | 10/12/2017 | $7,848.50† |
| 9/15/2016 | $2,485.00 * | 10/30/2017 | $18,325.97* |
| 9/28/2016 | $11,191.58* | 10/30/2017 | $1,250.00† |
| 10/4/2016 | $46,289.67* | 11/15/2017 | $11,879.03* |
| 10/28/2016 | $51,405.05* | 11/15/2017 | $1,250.00† |
| 11/26/2016 | $46,193.87‡ | 11/22/2017 | $1,526.71† |
| 12/8/2016 | $46,193.87* | 11/22/2017 | $10,000.00† |
| 12/23/2016 | $1,880.00* | 11/30/2017 | $18,169.51* |
| 12/29/2016 | $45,282.92* | 12/21/2017 | $1,250.00* |
| 1/23/2017 | $46,314.94‡ | 12/18/2017 | $1,250.00† |
| 2/6/2017 | $49.50* | 1/2/2018 | $25,477.48* |
| 2/14/2017 | $6,541.75* | 1/9/2018 | $1,250.00† |
| 2/16/2017 | $1,000.00* | 1/23/2018 | $1,250.00† |
| 3/3/2017 | $43,628.27* | 1/24/2018 | $19,618.23* |
| 3/27/2017 | $44,177.28* | 2/6/2018 | $1,250.00† |
| 4/18/2017 | $4,941.61* | 2/21/2018 | $225.76† |
| 5/5/2017 | $18,631.39* | 2/21/2018 | $1,862.75* |
| 5/23/2017 | $3,100.00* | 2/27/2018 | $1,250.00† |
| 6/7/2017 | $21,032.21* | 2/27/2018 | $18,339.69* |
| 6/19/2017 | $5,692.46* | 3/21/2018 | $1,250.00† |
| 6/29/2017 | $1,270.00* | 3/26/2018 | $1,250.00† |
| 7/5/2017 | $20,896.39* | 3/28/2018 | $18,700.65* |
| 7/27/2017 | $3,020.07* | 4/13/2018 | $1,250.00† |
| 8/2/2017 | $18,290.75* | 4/15/2018 | $18,700.65‡ |
| 8/21/2017 | $6,124.54* | 4/25/2018 | $1,692.92† |
| 9/5/2017 | $2,800.00§ | 5/2/2018 | $18,700.65* |
| 9/5/2017 | $17,524.75* | 5/10/2018 | $1,250.00† |
| 9/15/2017 | $1,900.00* | 5/22/2018 | $17,367.01§ |
| 9/15/2017 | $60.00† | 5/22/2018 | $1,250.00† |
| 9/15/2017 | $1,284.35† | 6/11/2018 | $6,317.64* |
| 9/19/2017 | $216.75* | 6/11/2018 | $1,250.00† |
| | | **Total:** | **$960,158.73** |

---

* Transfer into Dash account ending 5867.
† Transfer into Barn Door Account ending 1709.
‡ Transfers to Dash ta da Moon LLC per Rice production.
§ Transfer into Dash account ending 5008.

## <u>Schedule 2.1</u>

**Horse Transfers**
**(on or within two years before the Petition Date)**

| Horse | Transfer/Purchase Date | Seller/Transferor | Buyer/Transferee |
|---|---|---|---|
| Star War Cutter Lynx | 10/12/2016 | Unknown | Dash ta da Moon, LLC |
| Letta Brother Do It | 1/26/2017 | Unknown | Dash ta da Moon, LLC |

## Schedule 3.1

## Vehicle Transfers
### (on or within two years before the Petition Date)

| Registered Owner | Year | Make | Style | Plate | Address | City | VIN |
|---|---|---|---|---|---|---|---|
| DARCY HUGHES | 1995 | Ferrari | Coupe | YBV158 | 36550 NE WILSONVILLE | NEWBERG | ZFFSP44A2S0101317 |
| DARCY HUGHES-SNOD6RASS | 2002 | Amerigo | 4 or 5 DR Sedan, etc. | ZKF191 | 36550 NE WILSONVILLE | NEWBERG | 17FA84322E200462 |
| DARCY HUGHES-SNOD6RASS | 2001 | Honda | Motorcycle | NA08886 | 36550 NE WILSONVILLE | NEWBERG | JH2DE02041K407302 |
| DARCY HUGHES-SNOD6RASS | 2001 | Honda | Motorcycle | N097356 | 36550 NE WILSONVILLE | NEWBERG | JH2ME03391M304034 |
| DARCY HUGHES-SNOD6RASS | 2001 | Honda | Motorcycle | N100812 | 36550 NE WILSONVILLE | NEWBERG | JH2AE03061K103793 |
| DARCY LA PIER HUGHES | 2001 | DHM | Boat Trailer | U303055 | 36550 NE WILSONVILLE | NEWBERG | 4KUBS21201C113196 |
| DARCY LA PIER HUGHES | 2000 | Amerigo | 4 or 5 DR Sedan, etc. | YCR258 | 1501 SE 102ND AV | VANCOUVER | 137ZA8431YE190268 |
| DARCY LA PIER HUGHES | 2002 | SUZUK | Vanette | NA25172 | 36550 NE WILSONVILLE | NEWBERG | LM4AA123421112819 |
| DARCY LA PIER SNODGRASS | 2006 | Mastercraft | Boat Trailer | U387661 | 7318 N OLIN AVE | PORTLAND | 19MSB262762E10237 |
| DARCY LA PIER SNODGRASS | 2005 | Dodge | 4 or 5 DR Wagon | 070BRG | 7318 N OLIN AVE | PORTLAND | 3D7KS28CX5G705782 |
| DARCY LA PIER SNODGRASS | 2005 | Platinum Mfg | HU | HU06049 | 7318 N OLIN AVE | PORTLAND | 5HMXG322851001867 |
| DARCY LA PIER SNODGRASS | 2005 | Bentley | 4 or 5 DR Sedan, etc. | 136CCS | 7318 N OLIN AVE | PORTLAND | SCBLF34F05CX10164 |
| DARCY LAPIER | 2010 | Ford F350 | Crew Pickup | | 36550 NE WILSONVILLE | NEWBERG | 1FTWW3BR4AEA67419 |
| DARCY LAPIER | 2007 | Cadillac | Escalade | | 36550 NE WILSONVILLE | NEWBERG | 1gyfk63807r171629 |
| DARCY LAPIER | 2006 | Land Rover Range | 4 Dr Wagon Sport Utility | | 36550 NE WILSONVILLE | NEWBERG | SALME15466A212286 |
| DARCY LAPIER | 2005 | GMC | Yukon | | 36550 NE WILSONVILLE | NEWBERG | 1GKEK63U25J206167 |
| DARCY LAPIER | 2004 | Cadillac | Escalade | | 36550 NE WILSONVILLE | NEWBERG | 3gyfk66n64g137692 |
| DARCY ROBERTSON | 1970 | Chevrolet | 2S | NWR360 | 3425 SW HOOD ST | PORTLAND | 194370S413748 |
| DARCY SNODGRASS | 2003 | Mastercraft | Boat Trailer | U335114 | 7318 N OLIN AVE | PORTLAND | 19MSB002430000044 |
| DASH TA DA MOON LLC | 2016 | Cadillac | 4 or 5 DR Wagon | 400GDW | 36550 NE WILSONVILLE | NEWBERG | 1GYS4BKJ3GR441670 |
| DASH TA DA MOON LLC | 2015 | Bloomer Trailer Mfg Inc | HT | HV00725 | 36550 NE WILSONVILLE | NEWBERG | 1B9BG3323FS511452 |
| DASH TA DA MOON LLC | 2015 | Ford | CW | *TURNBN | 36550 NE WILSONVILLE | NEWBERG | 1FT8W4DT5FEC36636 |
| DASH TA DA MOON LLC | 2013 | GMC | 4 or 5 DR Wagon | NV16276 | 36550 NE WILSONVILLE | NEWBERG | 1GKS2EEF8DR147945 |
| DASH TA DA MOON LLC | 2012 | AUDI | Utility | 088FMD | 36550 NE WILSONVILLE | NEWBERG | WA1AGAFE4CD001541 |
| DASH TA DA MOON LLC | 2011 | Ford F250 | Crew Pickup | NN36823 | 36550 NE WILSONVILLE | NEWBERG | 1FT7W2BT8BEA62557 |
| DASH TA DA MOON LLC | 2011 | Toyota Tacoma | Crew Pickup | 701FKE | 36550 NE WILSONVILLE | NEWBERG | 3TMLU4EN5BM079856 |
| DASH TA DA MOON LLC | 2008 | Bloomer Trailer Mfg Inc | Travel / Recreational Trailer | R852115 | 36550 NE WILSONVILLE | NEWBERG | 1SB9BG36228L511435 |
| DASH TA DA MOON LLC | 2007 | Freightliner | Truck | F169200 | 36550 NE WILSONVILLE | NEWBERG | 1FVAFHCV87HX13169 |
| DASH TA DA MOON LLC | 2006 | PLATI | LT | U465657 | 36550 NE WILSONVILLE | NEWBERG | 5HMXB182961002344 |
| DASH TA DA MOON LLC | 2004 | Eagle Trailers Inc. | Utility | HS93142 | 36550 NE WILSONVILLE | NEWBERG | 1C9BE12184P694568 |
| DASH TA DA MOON LLC | 1975 | Chevrolet | 2 or 3 DR Sedan, etc. | LQR214 | 36550 NE WILSONVILLE | NEWBERG | 1Z37J5S423086 |
| DASH TA DA MOON LLC | 1969 | Chevrolet | 2 or 3 DR Sedan, etc. | CK56221 | 36550 NE WILSONVILLE | NEWBERG | 124379N549539 |

**Schedule 1.2**

**Cash Transfers**
**(on or within four years before the Petition Date)**

| Date of Transfer | Amount of Transfer | Date of Transfer | Amount of Transfer | Date of Transfer | Amount of Transfer |
|---|---|---|---|---|---|
| 6/19/2014 | $10,000.00* | 1/31/2016 | $715.00§ | 9/5/2017 | $2,800.00† |
| 6/20/2014 | $26,650.00* | 2/28/2016 | $41,663.14§ | 9/5/2017 | $17,524.75* |
| 7/2/2014 | $40,560.29* | 3/29/2016 | $43,900.26§ | 9/15/2017 | $1,900.00* |
| 7/16/2014 | $3,751.90* | 4/6/2016 | $2,961.13§ | 9/15/2017 | $60.00‡ |
| 8/6/2014 | $39,690.23* | 4/13/2016 | $8,175.00§ | 9/15/2017 | $1,284.35‡ |
| 9/3/2014 | $39,941.11* | 4/26/2016 | $2,223.61§ | 9/19/2017 | $216.75* |
| 9/12/2014 | $3,620.52* | 4/26/2016 | $46,688.01§ | 9/28/2017 | $21,015.64* |
| 9/25/2014 | $6,308.74* | 5/6/2016 | $35,000.00§ | 9/28/2017 | $515.00‡ |
| 10/6/2014 | $38,071.07* | 5/14/2016 | $3,500.00§ | 10/2/2017 | $3,600.00* |
| 10/22/2014 | $3,888.40* | 5/16/2016 | $3,708.00§ | 10/12/2017 | $7,848.50‡ |
| 11/12/2014 | $45,607.10* | 5/28/2016 | $43,360.95§ | 10/30/2017 | $18,325.97* |
| 12/3/2014 | $40,590.00* | 6/6/2016 | $43,360.95* | 10/30/2017 | $1,250.00* |
| 12/9/2014 | $38,870.82* | 7/6/2016 | $48,675.34* | 11/15/2017 | $11,879.03* |
| 12/17/2014 | $5,649.66* | 7/25/2016 | $42,016.18* | 11/15/2017 | $1,250.00* |
| 2/21/2015 | $10,014.09§ | 8/8/2016 | $46,431.18* | 11/22/2017 | $1,526.71‡ |
| 2/22/2015 | $40,533.08§ | 9/6/2016 | $46,233.27* | 11/22/2017 | $10,000.00‡ |
| 3/29/2015 | $1,609.40§ | 9/15/2016 | $2,485.00* | 11/30/2017 | $18,169.51* |
| 3/29/2015 | $38,213.13§ | 9/28/2016 | $11,191.58* | 12/21/2017 | $1,250.00* |
| 4/15/2015 | $7,126.00§ | 10/4/2016 | $46,289.67* | 12/18/2017 | $1,250.00* |
| 4/28/2015 | $36,673.31§ | 10/28/2016 | $51,405.05* | 1/2/2018 | $25,477.48* |
| 5/6/2015 | $676.20§ | 11/26/2016 | $46,193.87§ | 1/9/2018 | $1,250.00* |
| 5/10/2015 | $3,705.00§ | 12/8/2016 | $46,193.87* | 1/23/2018 | $1,250.00‡ |
| 5/20/2015 | $38,728.04§ | 12/23/2016 | $1,880.00* | 1/24/2018 | $19,618.23* |
| 5/20/2015 | $1,866.86§ | 12/29/2016 | $45,282.92* | 2/6/2018 | $1,250.00* |
| 6/28/2015 | $18,000.00§ | 1/23/2017 | $46,314.94§ | 2/21/2018 | $225.76‡ |
| 7/8/2015 | $28,083.70§ | 2/6/2017 | $49.50* | 2/21/2018 | $1,862.75* |
| 7/20/2015 | $7,404.17§ | 2/14/2017 | $6,541.75* | 2/27/2018 | $1,250.00‡ |
| 7/25/2015 | $38,844.39§ | 2/16/2017 | $1,000.00* | 2/27/2018 | $18,339.69* |
| 8/29/2015 | $36,344.65§ | 3/3/2017 | $43,628.27* | 3/21/2018 | $1,250.00* |
| 9/2/2015 | $12,929.14§ | 3/27/2017 | $44,177.28* | 3/26/2018 | $1,250.00‡ |
| 9/30/2015 | $38,373.93§ | 4/18/2017 | $4,941.61* | 3/28/2018 | $18,700.65* |
| 10/22/2015 | $40,578.66§ | 5/5/2017 | $18,631.39* | 4/13/2018 | $1,250.00* |
| 11/18/2015 | $9,538.96§ | 5/23/2017 | $3,100.00* | 4/15/2018 | $18,700.65§ |
| 11/18/2015 | $40,026.25§ | 6/7/2017 | $21,032.21* | 4/25/2018 | $1,692.92‡ |
| 12/26/2015 | $2,495.00§ | 6/19/2017 | $5,692.46* | 5/2/2018 | $18,700.65* |
| 12/26/2015 | $39,822.25§ | 6/29/2017 | $1,270.00* | 5/10/2018 | $1,250.00* |
| 1/4/2016 | $5,400.00§ | 7/5/2017 | $20,896.39* | 5/22/2018 | $17,367.01† |
| 1/17/2016 | $23,642.30§ | 7/27/2017 | $3,020.07* | 5/22/2018 | $1,250.00* |
| 1/24/2016 | $6,076.03§ | 8/2/2017 | $18,290.75* | 6/11/2018 | $6,317.64* |
| 1/30/2016 | $43,276.72§ | 8/21/2017 | $6,124.54* | 6/11/2018 | $1,250.00‡ |

**Total:  $2,148,595.88**

---

* Transfer into Dash account ending 5867.
† Transfer into Dash account ending 5008.
‡ Transfers into Barn Door account ending 1709.
§ Transfers to Dash ta da Moon LLC per Rice production.

**Schedule 2.2**

**Horse Transfers**
**(on or within four years before the Petition Date)**

| Horse | Transfer/Purchase Date | Seller/Transferor | Buyer/Transferee |
|---|---|---|---|
| MP Vaqueros Star | 9/30/2014 | Unknown | Dash ta da Moon, LLC |
| Roosters Handyman | 4/20/2016 | Unknown | Dash ta da Moon, LLC |
| Star War Cutter Lynx | 10/12/2016 | Unknown | Dash ta da Moon, LLC |
| Letta Brother Do It | 1/26/2017 | Unknown | Dash ta da Moon, LLC |

**Schedule 3.2**

**Vehicle Transfers**
**(on or within four years before the Petition Date)**

| Registered Owner | Year | Make | Style | Plate | Address | City | VIN |
|---|---|---|---|---|---|---|---|
| DARCY HUGHES | 1995 | Ferrari | Coupe | YBV158 | 36550 NE WILSONVILLE | NEWBERG | ZFFSP44A2S0101317 |
| DARCY HUGHES-SNOD6RASS | 2002 | Amerigo | 4 or 5 DR Sedan, etc. | ZKF191 | 36550 NE WILSONVILLE | NEWBERG | 17FA84322E200462 |
| DARCY HUGHES-SNOD6RASS | 2001 | Honda | Motorcycle | NA08886 | 36550 NE WILSONVILLE | NEWBERG | JH2DE02041K407302 |
| DARCY HUGHES-SNOD6RASS | 2001 | Honda | Motorcycle | N097356 | 36550 NE WILSONVILLE | NEWBERG | JH2ME03391M304034 |
| DARCY HUGHES-SNOD6RASS | 2001 | Honda | Motorcycle | N100812 | 36550 NE WILSONVILLE | NEWBERG | JH2AE03061K103793 |
| DARCY LA PIER HUGHES | 2001 | DHM | Boat Trailer | U303055 | 36550 NE WILSONVILLE | NEWBERG | 4KUBS21201C113196 |
| DARCY LA PIER HUGHES | 2000 | Amerigo | 4 or 5 DR Sedan, etc. | YCR258 | 1501 SE 102ND AV | VANCOUVER | 137ZA8431YE190268 |
| DARCY LA PIER HUGHES | 2002 | SUZUK | Vanette | NA25172 | 36550 NE WILSONVILLE | NEWBERG | LM4AA123421112819 |
| DARCY LA PIER SNODGRASS | 2006 | Mastercraft | Boat Trailer | U387661 | 7318 N OLIN AVE | PORTLAND | 19MSB262762E10237 |
| DARCY LA PIER SNODGRASS | 2005 | Dodge | 4 or 5 DR Wagon | 070BRG | 7318 N OLIN AVE | PORTLAND | 3D7KS28CX5G705782 |
| DARCY LA PIER SNODGRASS | 2005 | Platinum Mfg | HU | HU06049 | 7318 N OLIN AVE | PORTLAND | 5HMXG322851001867 |
| DARCY LA PIER SNODGRASS | 2005 | Bentley | 4 or 5 DR Sedan, etc. | 136CCS | 7318 N OLIN AVE | PORTLAND | SCBLF34F05CX10164 |
| DARCY LAPIER | 2010 | Ford F350 | Crew Pickup | | 36550 NE WILSONVILLE | NEWBERG | 1FTWW3BR4AEA67419 |
| DARCY LAPIER | 2007 | Cadillac | Escalade | | 36550 NE WILSONVILLE | NEWBERG | 1gyfk63807r171629 |
| DARCY LAPIER | 2006 | Land Rover Range | 4 Dr Wagon Sport Utility | | 36550 NE WILSONVILLE | NEWBERG | SALME15466A212286 |
| DARCY LAPIER | 2005 | GMC | Yukon | | 36550 NE WILSONVILLE | NEWBERG | 1GKEK63U25J206167 |
| DARCY LAPIER | 2004 | Cadillac | Escalade | | 36550 NE WILSONVILLE | NEWBERG | 3gyfk66n64g137692 |
| DARCY ROBERTSON | 1970 | Chevrolet | 2S | NWR360 | 3425 SW HOOD ST | PORTLAND | 194370S413748 |
| DARCY SNODGRASS | 2003 | Mastercraft | Boat Trailer | U335114 | 7318 N OLIN AVE | PORTLAND | 19MSB002430000044 |
| DASH TA DA MOON LLC | 2016 | Cadillac | 4 or 5 DR Wagon | 400GDW | 36550 NE WILSONVILLE | NEWBERG | 1GYS4BKJ3GR441670 |
| DASH TA DA MOON LLC | 2015 | Bloomer Trailer Mfg Inc | HT | HV00725 | 36550 NE WILSONVILLE | NEWBERG | 1B9BG3323FS511452 |
| DASH TA DA MOON LLC | 2015 | Ford | CW | *TURNBN | 36550 NE WILSONVILLE | NEWBERG | 1FT8W4DT5FEC36636 |
| DASH TA DA MOON LLC | 2013 | GMC | 4 or 5 DR Wagon | NV16276 | 36550 NE WILSONVILLE | NEWBERG | 1GKS2EEF8DR147945 |
| DASH TA DA MOON LLC | 2012 | AUDI | Utility | 088FMD | 36550 NE WILSONVILLE | NEWBERG | WA1AGAFE4CD001541 |
| DASH TA DA MOON LLC | 2011 | Ford F250 | Crew Pickup | NN36823 | 36550 NE WILSONVILLE | NEWBERG | 1FT7W2BT8BEA62557 |
| DASH TA DA MOON LLC | 2011 | Toyota Tacoma | Crew Pickup | 701FKE | 36550 NE WILSONVILLE | NEWBERG | 3TMLU4EN5BM079856 |
| DASH TA DA MOON LLC | 2008 | Bloomer Trailer Mfg Inc | Travel / Recreational Trailer | R852115 | 36550 NE WILSONVILLE | NEWBERG | 1SB9BG36228L511435 |
| DASH TA DA MOON LLC | 2007 | Freightliner | Truck | F169200 | 36550 NE WILSONVILLE | NEWBERG | 1FVAFHCV87HX13169 |
| DASH TA DA MOON LLC | 2006 | PLATI | LT | U465657 | 36550 NE WILSONVILLE | NEWBERG | 5HMXB182961002344 |
| DASH TA DA MOON LLC | 2004 | Eagle Trailers Inc. | Utility | HS93142 | 36550 NE WILSONVILLE | NEWBERG | 1C9BE12184P694568 |
| DASH TA DA MOON LLC | 1975 | Chevrolet | 2 or 3 DR Sedan, etc. | LQR214 | 36550 NE WILSONVILLE | NEWBERG | 1Z37J5S423086 |
| DASH TA DA MOON LLC | 1969 | Chevrolet | 2 or 3 DR Sedan, etc. | CK56221 | 36550 NE WILSONVILLE | NEWBERG | 124379N549539 |